**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>FUNDS IN THE AMOUNT OF $271,080.00, )<br>    Defendant, )<br>_____ )<br>)<br>PEDRO CRUZ-HERNANDEZ and )<br>ABRAHAM CRUZ-HERNANDEZ, )<br>    Claimants. ) | Case No. 13 C 126<br><br>Judge Joan B. Gottschall |

**MEMORANDUM OPINION AND ORDER**

This case is an *in rem* civil forfeiture action about cash seized from a safe in a minivan parked in the driveway of a North Chicago residence. Contending that the funds were used in narcotics trafficking, the government seeks forfeiture pursuant to 21 U.S.C. § 881(a)(6). The court previously denied the government's motion for summary judgment but issued a rule to show cause why the court should not grant the government's motion that required claimants Pedro Cruz-Hernandez and Abraham Pedro Cruz-Hernandez to identify any additional evidence that supported their claim of ownership.[1] The court construes the claimants' memorandum as a motion to revisit portions of the summary judgment opinion. As such, it is denied. In addition, the government's motion for summary judgment is granted.

**I. BACKGROUND**

The latest round of filings does not challenge the court's prior summary of the facts relating to the discovery of the safe containing the money at issue in this case. The court

---

[1] To avoid confusion, the court will refer to Pedro Cruz-Hernandez and Abraham Pedro Cruz-Hernandez as Pedro and Abraham.

previously summarized those facts as follows:

> At about 1:00 a.m. on June 9, 2012, North Chicago Police Department (NCPD) officers responded to a 911 call reporting an apparent home invasion at 2124 Kemble Avenue in North Chicago, Illinois. Upon their entry into the residence, NCPD officers discovered that the apparent intruders were not present. While inside the residence, NCPD officers say they observed in plain view a 9mm handgun, plastic bags, canna residue, a knife, and zip-tie plastic fasteners.
>
> The officers observed three vehicles parked in the driveway behind the residence, including a red Chevrolet minivan. A Lake County Deputy Sheriff, who is also a K-9 handler, and a canine owned by the Lake County Sheriff's Department, conducted a narcotic-odor investigation of the exterior of the three vehicles. The canine alerted to the presence of narcotics on the van.
>
> Within the rear of the minivan, NCPD officers observed a black safe in plain view through the windows. A circuit-court judge in Lake County issued a warrant to search the residence and minivan and seize evidence, including cash and safes. In addition to the search warrant, claimant Pedro Cruz-Hernandez and a co-resident of 2124 Kemble signed a consent form for NCPD officers to search the residence.
>
> Officers conducted a search of the residence, minivan, and safe. The officers found $271,080 in cash in the safe, bundled together with elastic ponytail rubber bands in increments labeled "$5,000." NCPD officers found a handwritten ledger inside the safe that appears to contain dollar amounts, dates, and names.

(Dkt. 51 at 2-3.)

In their supplemental memorandum, the claimants challenge portions of the following additional facts set forth in the court's prior summary judgment opinion:

> When questioned by North Chicago police on June 9, 2012 about the safe, Pedro Cruz- Hernandez said: "I honestly don't know what is inside." (Tr. of Interview 16, ECF No. 43-5). The police inquired: "[Y]ou didn't know that there was money inside? It's not yours?" and Pedro Cruz-Hernandez replied, "It is not mine, no, it isn't." In a deposition taken in conjunction with this case, Pedro Cruz-Hernandez confirmed under oath that his answers on June 9, 2012 "were truthful and complete." (Dep. of Pedro Cruz-Hernandez 43, ECF No. 43-9.)
>
> Claimant Abraham Cruz-Hernandez has also made statements indicating that the money in the safe was not his. He filed an Application for Cancellation of Removal in removal proceedings before the Immigration Court for the U.S. Department of Justice, Executive Office of Immigration Review. That

> application states that from December 2004 to August 2012, Abraham
> Cruz-Hernandez resided at 2124 Kemble. The application states that Abraham
> Cruz-Hernandez's only assets are $2,000 in cash, stocks, or bonds that he owns
> jointly with his spouse. In a deposition, Abraham Cruz-Hernandez stated under
> oath that the information he provided in his application was true, accurate, and
> complete. (Dep. of Abraham Cruz-Hernandez 19, ECF No. 43-10.)

(*Id*. at 3).

When the court previously considered the government's motion for summary judgment, the claimants' evidence supporting their claim of ownership consisted of their affidavits asserting ownership and their claim for the seized $271,080 that was filed in this case. The claim states that the claimants "are the lawful, legitimate and rightful owners of all $271,080.00 U.S. Currency seized" and that the "[c]laimants were not involved in any criminal activity whatsoever. If any criminal activity occurred, claimants were innocent owners and did not know of the conduct giving rise to the forfeiture." (Claim ¶¶ 1, 3, Dkt. 7.) Both claimants signed the claim "[u]nder oath and being subject to the penalties of perjury." (*Id*. at 2.)

The claimants' supplemental memorandum attaches two new affidavits from Pedro and Abraham. Pedro's latest affidavit focuses on the deposition testimony that the court previously found contradicted multiple other statements disavowing an interest in the seized funds. He challenges the government's characterization of a portion of his deposition testimony regarding his statement to the police denying that he owned the funds. He also asserts that he gave money to his brother Abraham for safekeeping and that "throughout this litigation" he did not know where Abraham placed the money. (Dkt. 50-2 at 4.) He thus concludes that he did not knowingly disavow an interest in the money on June 9, 2012, when he told the police that the money in the safe was not his.

In Abraham's latest affidavit, he states that he disavowed any interest in the seized funds

to immigration officials in 2012 (both before and after the money was seized) because, "as a non-English speaker with a limited education," he did not physically possess funds that had been seized and thus did not know that he needed to disclose his claim of ownership in his immigration documents. (Dkt. 60-3, at 3-4.) Abraham also asserts that his language challenges prevented him from understanding the terms "assets" and "equities" so he did not realize that the funds at issue in this case were "assets" that needed to be disclosed. (*Id.* at 4.)

## II. LEGAL STANDARD

The court will, in an exercise of its discretion, evaluate the new submissions de novo using the legal standard applicable to summary judgment motions, rather than the more restrictive standard applicable to motions to reconsider. Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis.Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

When claimants file a claim of ownership under Supplemental Rule G(5)(a)(i) of the Federal Rules of Civil Procedure, their claim is evidence; "[i]t must be signed under penalty of

perjury and identify the claimant and the nature of his interest." *United States v. Funds in the Amount of $574,840*, 719 F.3d 648, 653 (7th Cir. 2013). Under Supplemental Rule G of the Federal Rules of Civil Procedure, "the government may move to strike a claim . . . because the claimant lacks standing." Fed. R. Civ. P. Supp. G(8)(c)(i).[2] The government may present a standing-based challenge in the form of a motion for summary judgment challenging the claimants' interest in the property. Fed. R. Civ. P. Supp. G(8)(c)(ii)(B); *Funds in the Amount of $574,840*, 719 F.3d at 653. To be entitled to forfeiture, the government must demonstrate, by a preponderance of the evidence, that the defendant funds are subject to forfeiture. *United States v. Funds in the Amount of $239,400*, — F. Supp. 2d —, No. 11 C 4448, 2014 WL 5023453, at *4 *Id*. at *6. If the government contends that the property is subject to forfeiture because it "was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense," the government must establish that there was a substantial connection between the property and the offense. *Id*. (citing 18 U.S.C. § 983(c)(3)).

"[W]hen a plaintiff/claimant is confronted with a valid challenge to his standing . . . it is no longer sufficient to simply rest on the facial validity of his standing claim." *United States v. Funds in the Amount of $239,400*, — F. Supp. 2d —, No. 11 C 4448, 2014 WL 5023453, at *4 (N.D. Ill. Oct. 7, 2014). Instead, he must point to evidence establishing the validity of his claim using a preponderance of the evidence standard. *Id*.; Fed. R. Civ. P. Supp. G(8)(c)(ii)(B).

---

[2] The Seventh Circuit has noted that Rule G's "use of the term 'standing' is unfortunate because striking a claim is a decision on the merits[; i]t is not a determination that the claimant has failed to show that the court has jurisdiction."

### III. DISCUSSION

The claimants take issue with the court's finding that they previously disclaimed ownership of the funds, both under oath in their depositions and elsewhere. If so, the claimants' sworn testimony would contradict their affidavits asserting that they own the funds at issue. This would mean that the affidavits are not enough to withstand the government's motion for summary judgment.

### A. Pedro

In the affidavit submitted with the claimants' response to the rule to show cause, Pedro denies telling police that he did not own the money recovered from the safe or know who owned the money. He also argues that his deposition testimony does not contradict any alleged statement to the police. Instead, he contends that his testimony shows that he was "confused," that the government's questions were open-ended and thus were unanswerable, and that he "never provided sworn testimony that he disclaimed ownership." (Dkt. 60 at 2.)

As noted by the government, the record contains a transcript of Pedro's interview with a North Chicago Police officer on June 9, 2012, shortly after the defendant currency was seized. The transcript contradicts Pedro's current position regarding his statements to law enforcement:

> Officer: And your car is the red one, right? The red minivan?
>
> Pedro: Uh-huh. Yes.
>
> Officer: And you don't know the safe—?
>
> Pedro: I honestly don't, I'm being completely honest with you. I assure you that I really don't know. I don't know . . . what is inside, and I don't have the key, I don't, to open that . . . .
>
> Officer: Why did you go pull out that safe?

| | |
|---|---|
| Pedro: | Because that safe, I really . . . I really . . . I saw that safe there and my brother [Abraham] told me that I should keep that safe for him, because it had some very important papers inside, but I don't really know. And I asked [Abraham], "Is it yours?" And he told me, "No, it's not mine." "So, then why are you keeping it here?" |
| Officer: | Uh-huh. |
| Pedro: | And he . . . |
| Officer: | And this is Abraham? |
| Pedro: | Right. But I don't, I don't, I honestly don't know what is inside . . . |
| Officer: | You didn't know what was inside [the safe]? |
| Pedro: | I, I didn't, honestly, I didn't. |
| Officer: | You didn't know . . . you didn't know that there was money inside? It's not yours? |
| Pedro: | It is not mine, no, it isn't. |
| Officer: | You don't know whose it is? |
| Pedro: | No. |

(Doc. 43-5, at pp. 13-16.)

Despite this testimony, Pedro asserts that during his deposition, he did not say that his statements to the police were truthful. In support, he points to the following exchange:

Q. Okay. And then do you remember talking to the police on June 9th, 2012?

A. July 9th.

Q. No. June 9th, 2012, after the intruders came to your house.

A. Yes.

Q. Do you remember that they asked you questions?

A. Yes.

Q. And do you remember giving them answers?

A. Yes.

Q. Did you give them answers to their questions that were truthful and complete?

A. Are you referring to the ones that first came in or to the police?

Q. I'm referring to the police.

A. Yes.

Q. Yes, you gave the police true and complete information?

MR. ZEIT [claimant's counsel]: Let me object to that. That's a bit open-ended. It's hard to tell.

Q. You remember them asking you questions, right?

MR. ZEIT: Let me object to that. Do you have a certain question you want to ask him? You can ask him that question.

Q. Do you remember the police asking you questions on June 9th, 2012?

A. Some of the questions, yes.

(Whereupon, the following question was certified.)

Q. Okay. Did you tell them information that was incorrect?

MR. ZEIT: Let me object to that. There is no way to properly answer that. Don't answer that. You can certify that.

Q. Do you recall being confused by their questions?

A. I'm not going to answer those.

MR. ZEIT: You can answer that.

Q. You have to answer that.

-8-

A. Some of them I remember.

Q. Okay. Do you recall if there were any questions that confused you?

A. Maybe, yes.

Q. Okay. Did you point out to them any questions that confused you?

A. I don't remember exactly.

(Dkt. 60-1, Ex. A at 95:5-97:10.)

This portion of Pedro's deposition testimony is, at best, evasive. In any event, in his summary judgment filings, Pedro agreed that this *same* deposition testimony shows that he "provided the North Chicago Police with truthful and complete answers in response to their questions." (Dkt. 46 at 6, ¶ 21). Moreover, in addition to the deposition excerpt quoted above, during Pedro's deposition, he agreed that "because of [his] phone call with [his] brother [he] learned that [his] money was in the safe" and that on the night of the home invasion, he "knew that at least half of the money in the safe was [his]." (Dkt. 61-6 at 52:15-18, 53:11-20.) He also agreed that he had "answered several times [during the deposition] that [Abraham told him] that night that there was money in the safe." (*Id*. at 54:6-16.)

In addition, in the claimants' statement of additional facts filed with this court in opposition to the government's motion for summary judgment, Pedro and Abraham stated that they "placed this savings [cash earned from working as disc jockeys] in a black safe, which has been described in Plaintiff's Complaint for Forfeiture, as well as its Motion for Summary Judgment." See Dkt. 46 at 22. This affirmative representation flatly contradicts Pedro's new affidavit stating that he "was unaware where my brother, Abraham, placed my funds while he

was safekeeping them for me" and that "throughout this litigation" he has maintained that he "was unaware" where Abraham put the money.[3] (Dkt. 60-2 at ¶ 6, 13.)

In sum, the court gave Pedro an opportunity to present additional evidence to support his claim. It did not authorize him to jettison all of his prior admissions (including his sworn deposition testimony) and start over again with a different version of the facts. Pedro's sworn deposition testimony speaks for itself (as do his summary judgment filings submitted with the assistance of counsel). A litigant may not "manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony." *United States v. Funds in the Amount of $100,120.00*, 730 F.3d 711, 718 (7th Cir. 2013). Pedro's efforts to use his new affidavit to distance himself from his deposition is, therefore, unavailing.

**B.    Abraham**

Like Pedro, Abraham has submitted a new affidavit attempting to distance himself from his statements to immigration officials disclaiming any interest in the seized funds. In this affidavit, he states that he did not understand that he needed to disclose the money from the safe to the immigration officials because the money had been taken from him and was not currently in his possession. He also asserts that as a non-English speaker with a limited education, he did not understand that he needed to disclose the money.

A "record of deportable/inadmissible alien" form dated April 30, 2012 (approximately two months before the seizure) memorializes Abraham's statement to immigration officials that he did not have any "Monies Due/Property in U.S. Not in Immediate Possession." (Dkt. 43-6 at

---

[3] The government also contends that Pedro's current position is inconsistent with multiple aspects of his sworn discovery responses. The court need not reach this additional group of allegedly inconsistent sworn statements.

2.)  At this time, the safe was in Abraham's basement.  Thus, his contention that he did not realize he needed to disclose the money because it had been taken from him fails to match up with the timeline of events.

In addition, on October 5, 2012, Abraham filed the DEA claim at issue in this case that asserts a claim of ownership.  Nevertheless, in November 2012, Abraham disavowed ownership to immigration officials when he filed – under penalty of perjury – an application for cancellation of removal status.  Abraham cannot have it both ways; he either has an ownership interest in the money (per his DEA claim) or he does not (per his statements to immigration officials).  Abraham himself answered this conundrum at his deposition, when he testified that he gave "complete and truthful answers" to the immigration officials, "told the truth," and did not "leave out, omit, information."  (Dkt. 43-10 at 68:7-9, 69:1-20.)  He cannot retract this testimony via a subsequent affidavit.  *See Funds in the Amount of $100,120.00*, 730 F.3d at 718.

With respect to Abraham's current contention that his language and education limitations mean that he did not understand what information the immigration forms required, the government notes that Abraham competed his application for cancellation of removal status with the assistance of counsel.  The form states that the "completed application was read to the applicant in a language the applicant speaks fluently for verification before he . . . signed the application in my [the preparer's] presence."  (Dkt. 43-7 at 10.)  Abraham's attorney, who helped him fill out the form, also acknowledged that she was "aware that the knowing placement of false information on the Form EOIR-42B may subject [her] to civil penalties under 8 U.S.C. 1324c."  (*Id*.)  Abraham's submissions about the alleged language issue are conclusory and do not engage with or acknowledge these statements.

In sum, the court finds that Abraham's affidavit "involve[s] contradictions so clear that the only reasonable inference [is] that [it is] a sham designed to thwart the purposes of summary judgment." *Castro v. DeVry Univ., Inc.*, — F.3d —, No. 13-1934, 2015 WL 2231823, at *10 (7th Cir. May 13, 2015). Abraham, like Pedro, is bound by his prior disavowal of an ownership interest despite his new affidavit.

**C.    The Government's Motion for Summary Judgment**

In the government's motion for summary judgment, it argued that it had established by a preponderance of the evidence that the funds were forfeitable because "there is a substantial connection between the currency and drug trafficking." (Gov't Mem. at 18, Dkt. 43.) The government presented evidence showing that the chain of events culminating with the discovery of the safe containing the money at issue in this case started when the police responded to a 911 call reporting an apparent home invasion. When the officers entered the residence, they did not find an intruder, but say that they saw a 9mm handgun, plastic bags, cannabis, a digital scale with white powder residue, a knife, and zip-tie plastic fasteners in plain view.

The officers observed three vehicles parked in the driveway behind the residence, including a red Chevrolet minivan. A Lake County Deputy Sheriff, who is also a K-9 handler, and a canine owned by the Lake County Sheriff's Department, conducted a narcotic-odor investigation of the vehicles' exteriors. The canine alerted to the presence of narcotics on the van which, according to the officers, contained a safe in plain view. A circuit court judge issued a warrant to search the residence and minivan and seize evidence, including cash and safes. Inside the safe, the officers found $271,080 in cash, bundled together in increments labeled

"$5,000." They also found a handwritten ledger that appeared to contain dollar amounts, dates, and names.

In addition, to challenge the claimants' suggestion that the seized currency represented their combined savings from employment, the government submitted the claimants' tax records, bank records, and evidence of their liabilities and expenses, as well as Abraham's immigration documents where he listed his sources of income under penalty of perjury.

The claimants' evidence to the contrary consisted of the verified claims to the money and affidavits stating that they never used or intended to use the funds in drug trafficking and that they earned the funds by working at various jobs over the course of several years. The claimants' affidavits also deny that either had been in the business of selling drugs and that no narcotics had come into contact with the safe, the funds, or the minivan in which police found the safe.

The court previously found that the affidavits were sufficient to create a disputed question of material fact as to whether the claimants legitimately acquired the funds and that this question precluded summary judgment in the government's favor on the issue of forfeitability. Nevertheless, the court observed that it had serious doubts that claimants would be able to demonstrate their ownership interest in the funds at trial or in a summary judgment proceeding on the question of ownership given the claimants' prior disavowals of ownership. Thus, the court ordered the claimants to show cause why it should not grant summary judgment in favor of the government on the merits of their ownership claim.

In response, the claimants submitted the affidavits discussed above. As detailed above, these affidavits (and the claimants' prior affidavits) are conclusory, fail to explain the claimants'

prior disavowals of ownership under oath, and are insufficient to negate those prior disavowals. The "general rule" is that "unsubstantiated, self-serving affidavits may be used to defeat a motion for summary judgment" only if they do "not contradict any prior sworn statement." *See Funds in the Amount of $100,120.00*, 730 F.3d at 718; *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party.").

The affidavits submitted by the claimants in this case fail to meet this undemanding standard. The court has given the claimants multiple opportunities to substantiate their claim of ownership via evidence that does not contradict their prior sworn testimony. Nevertheless, the claims of ownership filed in this case, the claimants' sworn denials of an ownership interest, and their contradictory affidavits attempting to retract these denials remain the claimants' sole evidence of ownership.

In contrast, the government has pointed to substantial circumstantial evidence indicating that the claimants' interest in the money is not legitimate and that the money is connected to criminal activity. Given this record, the claimants' problematic affidavits about ownership are simply insufficient. Moreover, the government has set forth a compelling circumstantial case showing that the money at issue is the product of illegal activities. *See Funds in the Amount of $239,400*, 2014 WL 5023453, at *6 (granting the government's motion for summary judgment where the "totality of the circumstances" – including a positive dog alert, "the sheer amount of cash and its denominational form [and] the unusual way in which it was packaged," the

claimant's "suspicious travel arrangements, and the absence of any credible explanation for any [of] it" – established a substantial connection between the cash and illegal narcotics activity). Accordingly, the government's motion for summary judgment is granted.

## IV. CONCLUSION

As detailed above, the court construes the claimants' "memorandum of additional support [60] as a motion to revisit portions of the summary judgment opinion. As such, it is denied. In addition, the claimants' "memorandum of additional support" and supporting materials are insufficient to withstand the government's motion for summary judgment. Thus, the government's motion for summary judgment [43] is granted. The defendant currency in the amount of $271,080 is forfeited to the United States. The clerk is directed to enter judgment accordingly.

Date: June 29, 2015                                       /s/
                                                          Joan B. Gottschall
                                                          United States District Judge